UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| B.T., | ) |
| Plaintiff, | ) ) ) |
| v. | ) Cause No. 1:23-CV-325-HAB |
| SMITH-GREEN COMMUNITY SCHOOL CORPORATION, et al., | ) ) ) ) |
| Defendants. | ) |

**OPINION AND ORDER**

Sayre's law, named after twentieth century political scientist and Columbia University professor Wallace Stanley Sayre, posits that: "In any dispute the intensity of feeling is inversely proportional to the value of the issues at stake." KEYES, RALPH, THE QUOTE VERIFIER: WHO SAID WHAT, WHERE, AND WHEN 1 (St. Martin's Press 2007). The best-known invocation of Sayre's law is generally credited to the late Henry Kissinger, who was said to have quipped: "Academic politics are so vicious precisely because the stakes are so small." *Id*.

If only Kissinger had lived to see the modern state of youth sports. B.T., then a sophomore at Churubusco High School ("CHS"), was benched near the end of the 2022-2023 girls' varsity basketball season. This was either because B.T., encouraged by her mother, was a poor sport who sought to undermine the head coach or because Defendants were retaliating against her in violation of Title IX. B.T.'s response to the benching was to file this federal lawsuit.

Not content to simply let the suit play out, B.T. seeks a preliminary injunction. (ECF No. 13). She asks this Court to issue an injunction "(1) prohibiting Defendants from retaliating against B.T.; (2) declaring that B.T. is a member of the CHS Women's Basketball team; and (3) allowing B.T. to participate in basketball games as she did before" she was benched in January 2023. (ECF

No. 14 at 17). The request for a preliminary injunction is now fully briefed (ECF Nos. 14, 23, 25)[1] and is ripe for ruling.

I.   **Factual Background**

B.T. was a sophomore at CHS and a guard on the CHS girls' basketball team during the 2022-2023 school year. The problems started in January 2023. At a practice on the fifth, B.T. touched the team's head coach, David Goodwell ("Goodwell"), on the hip or the side of his buttocks with her hand. Goodwell found the contact "inappropriate, unwelcomed, and offensive," so he reported it to the school's athletic director, Nathan Wright ("Wright"). Wright, Goodwell, and B.T. met the next day to discuss the incident. Wright explained to B.T. that her conduct was inappropriate, and B.T. apologized.

B.T. did not start that night's game as punishment but played in all four quarters. Following the game, B.T.'s mother, D.T.[2], texted the parents of other players stating, "we are 3-11. Another senseless loss. I am so done with this manic, irrational coaching. What a colossal mistake to move her here."

The next day, January 7, D.T. sent a long email to Wright and Terrence Roe ("Roe"), principal of CHS. B.T. describes the email as "regarding multiple instances of sexually inappropriate and/or sexual harassment like-behavior with women student-athletes by Goodwell and by a female assistant." (ECF No. 14 at 9). The Court has reviewed the email (ECF No. 24-2) and cannot agree with that description. In the letter, D.T. complains:

---

[1] Defendants have moved to file a sur-reply. (ECF No. 27). Because the Court can rule on B.T.'s request for a preliminary injunction without additional input from the parties, that motion is DENIED.
[2] The parties both refer to B.T.'s mother as D.T., despite D.T. presumably being an adult. The Court will do the same.

2

- Goodwell and a player travelled together to watch basketball games. This bothered D.T. because, "[t]his particular girl comes from a really messed up home life," and says, "stupid stuff to other kids regularly." D.T. believed this was a "scandal in the making for the school."

- Goodwell tried to "pit the players against each other" by making upperclassmen responsible for disciplining underclassmen.

- An assistant coach, "Coach Brooke," undermined Goodwell to the players.

- Goodwell favored some players over others.

The real reason for the email seems to be to complain about the January 5 practice incident. D.T. spends paragraphs disputing Goodwell's version of the incident, closing by saying, "I am livid about this. I am not going to let this go. I will absolutely clear [B.T.'s] name from this allegation." (ECF No. 24-2 at 3). D.T. made several demands at the close of the email, including a "review of the truthfulness" of Goodwell's accusation against B.T., a public apology from Goodwell to B.T., for B.T. to finish the season, a review of "Goodwell's conduct with any other player outside of school events," and a parent meeting.

The email was blocked by CHS' spam filter but was eventually delivered on January 11. Wright, Roe, and B.T. met the same day to discuss the allegations. During the meeting, B.T. showed Wright and Roe a video which she has alternatively described as "a player simulating a sex act" with Goodwell (ECF No. 15 at 35) and "the rubbing of a player's genitals" on Goodwell's back (ECF No. 26 at 3). B.T.'s characterization is an embellishment at best and a lie at worst. What the video showed was Goodwell doing a pushup while a player sat on his back. Wright would later be given a photo of B.T. doing exactly the same thing.

The last game B.T. played was a January 12 victory over Hamilton High School. After that game, Goodwell decided to bench B.T. for the rest of the season. He claims that the decision was

made because "B.T. engaged in conduct that was detrimental to the team, which included spreading rumors about [Goodwell's] future as a coach." (ECF No. 24-3 at 2). Goodwell also points to an incident during a January 24 loss to South Adams High School where B.T. took off her shoes on the bench and cheered for the other team as a basis for her ongoing benching.

B.T. has a different explanation for her benching. She claims that, on January 20, she asked Goodwell why she was not playing. He responded that he would not play B.T. because "she got him in trouble."

In any event, B.T. did not play again during the 2022-2023 season, including CHS' sectional loss to Westview High School. In fact, B.T. was not even on the roster for the sectional game. This incensed D.T. After learning of B.T.'s omission, D.T. wrote an email to Wright demanding "a full sports release of [B.T.] so that she cannot be restricted from playing sports elsewhere next year." In the same email, D.T. promised to "sue everyone involved in this." Later that night, D.T. sent a text message to players, parents, and coaches of the CHS girls' basketball team calling Goodwell a "spin[e]less POS"—or piece of shit—because he did not tell B.T. "to her face" that she would not be on the sectional roster.

CHS finished the season with a 5-18 record, including 2-9 in conference. B.T. finished the season averaging 5.9 points per game on 29% shooting, 3.5 rebounds, 2.5 assists (with a negative assist-to-turnover ratio), 1.4 steals, and 0.1 blocks per game.[3]

B.T. continued to be disciplined after the season finished. B.T. was not given the award for having the most assists on the team despite leading the team in assists. Goodwell states that this snub was because of B.T.'s detrimental conduct. B.T. was removed from the team's text chat. Defendants claim that this was because of D.T.'s inappropriate text, but B.T. notes that D.T.'s text

---

[3] All statistics are taken from https://www.maxpreps.com/in/churubusco/churubusco-eagles/basketball/girls/22-23/stats/.

was sent to a players, parents, and coached text chat, but she was removed from a coaches and players text chat. B.T. was also excluded from summer team activities, her number was given to another player, and her name was omitted from the 2023-2024 team t-shirt.

Some of these issues have been resolved. B.T. has her number back, has been reinstated to the team text chat, and has been instructed to obtain her basketball gear from an assistant coach. Sadly, the t-shirt remains unchanged.

**II.     Legal Discussion**

**A.     *Preliminary Injunction Standard***

A preliminary injunction is a "very far-reaching power, never to be indulged in except in a case clearly demanding it." *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021). To obtain a preliminary injunction, B.T. must show that (1) she will suffer irreparable harm before the final resolution of her claims; (2) available remedies at law are inadequate; and (3) she has a likelihood of success on the merits. *See BBL, Inc. v. City of Angola*, 809 F.3d 317, 323–24 (7th Cir. 2015). If the moving party makes this showing, the court then "weighs the competing harms to the parties if an injunction is granted or denied," "considers the public interest," and employs a "sliding-scale analysis" ("the greater the likelihood of success on the merits, the less heavily the balance of harms must tip in the moving party's favor"). *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013). A preliminary injunction ordering a defendant to take an affirmative act rather than merely refrain from specific conduct is "cautiously viewed and sparingly issued." *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997) (quotation marks and citation omitted).

**B.     *B.T. has not Established a Likelihood of Success on the Merits***

Defendants seemingly concede the first two threshold requirements for a preliminary injunction, focusing their argument on B.T.'s likelihood of success on the merits. To show a

likelihood of success on the merits, B.T. must make a "strong showing that she is likely to succeed on the merits" of her claim; a mere "possibility of success is not enough" to warrant emergency relief. *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020). This showing "does not mean proof by a preponderance," but requires B.T. to provide facts and legal theories supporting "the key elements of [her] case." *Id*. at 763.

B.T.'s case is one for retaliation under Title IX. Title IX prohibits educational institutions from retaliating against people who speak out against sexual harassment. *See, e.g.*, *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005). To establish a claim for retaliation under Title IX, B.T. must allege that (1) she engaged in a statutorily protected activity; (2) the school took a materially adverse action against her; and (3) there existed a but-for causal connection between the two. *See Burton v. Bd. of Regents of Univ. of Wisconsin Sys.*, 851 F.3d 690, 695 (7th Cir. 2017).

Starting with the first element, Defendants argue that neither D.T.'s January 7 email nor B.T.'s accusations at the January 11 meeting constitute protected activity under Title IX. B.T. argues that "the underlying complaint is irrelevant in assessing a retaliation charge." (ECF No. 25 at 3). The Court finds merit in both positions.

It is true that, in a retaliation case, the complained-of conduct need not have violated Title IX. *Doe v. Univ. of Chicago*, No. 16 C 08298, 2017 WL 4163960, at *9 (N.D. Ill. Sept. 20, 2017) ("the fact that the conduct a plaintiff challenges turns out not to be sexual harassment in the legal sense does not necessarily undermine a retaliation claim"). But just like in a Title VII retaliation case, there must at least be a good-faith belief on B.T.'s part that the complained-of conduct was prohibited by Title IX. *Id.*, citing *Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 752 (7th Cir. 2002) (explaining that, in the Title VII context, all that is required is a good-faith belief that the practice

plaintiff opposed violated Title VII); *Alexander v. Gerhardt Enters., Inc.*, 40 F.3d 187, 195–96 (7th Cir. 1994) (same). Since both parties largely agree that the complained-of conduct did not violate Title IX, that leaves only whether B.T. and D.T. had a good-faith belief that it did.

Based on the limited record before it, the Court cannot conclude that B.T. or D.T. had a good-faith belief that she was complaining of activity prohibited by Title IX. Rather, it seems to the Court that both women believed that B.T. was wrongly accused of inappropriate sexual contact during the January 5 practice incident and sought to retaliate in-kind.

Why does the Court reach this conclusion? Several reasons. First are the almost nonsensical ways that B.T. characterizes facts in her briefing. B.T. describes D.T.'s email to Wright and Roe as alleging "multiple instances of sexually inappropriate and or/sexual [sic] harassment like-behavior [sic] with women student athletes by Goodwell and by a female assistant coach on the Churubusco High school [sic] staff." (ECF No. 14 at 6). As discussed above, such a description is fabricated. Reasonable minds could differ as to whether D.T. was alluding to an inappropriate relationship between Goodwell and a player in the email, but there were not "multiple instances of sexually inappropriate" behavior outlined in the email.

More outrageous, and offensive, is B.T.'s description of the video she showed Wright and Roe during the January 11 meeting. Again, the video portrayed Goodwell doing a pushup while one of his players sat on his back. But B.T. takes this innocuous video and describes it, in affidavits, as "a player simulating a sex act" with Goodwell (ECF No. 15 at 35) and "the rubbing of a player's genitals" on Goodwell's back (ECF No. 26 at 3). If B.T. is willing to mischaracterize facts under oath, if not outright make them up, and present them to a federal court in pursuit of a preliminary injunction, the Court has little trouble concluding that she acted in less-than-good-faith when making similar, spurious claims to CHS administrators.

7

The Court also finds the timing of B.T. and D.T.'s complaints to be probative. Nothing in the record shows, before January 5, any concern by B.T. or D.T. regarding Goodwell's coaching or conduct. But just hours after B.T. did not start the January 6 game, D.T. sent a text to team parents calling Goodwell's coaching "manic" and "irrational." The next day D.T. sent off a fiery diatribe with what can be best described as penny-ante complaints by a mom who is unhappy with her child's playing time. Four days later B.T. showed Wright and Roe a video of conduct *she also engaged in*, but which she now describes in pornographic terms. If the goal of B.T. and D.T. was to report statutorily prohibited sexual harassment and not to lash out against the consequences for B.T.'s conduct, then it is reasonable to ask why the alleged harassment only surfaced after January 6.

Simply put, and based only on the record before it, the Court sees no facts or legal theories that would demonstrate that B.T. engaged in statutorily protected activity. She neither complained of actionable sexual harassment under Title IX, nor had a good-faith belief that she was doing so. She cannot, then, show a likelihood of success on the merits of her Title IX retaliation case.

C.    ***The Balancing of Harms does not Weigh in B.T.'s Favor***

Even if B.T. could show some likelihood of success, the Court would not find that the balancing of the equities would support the entry of an injunction. The Seventh Circuit has emphasized that the purpose of the sliding scale approach to injunctive relief:

> is that the task for the district judge in deciding whether to grant or deny a motion for preliminary injunction is to minimize errors: the error of denying an injunction to one who will in fact (though no one can know this for sure) go on to win the case on the merits, and the error of granting an injunction to one who will go on to lose. The judge must try to avoid the error that is more costly in the circumstances. That cost is a function of the gravity of the error if it occurs and the probability that it will occur. The error of denying an injunction to someone whose legal rights have in fact been infringed is thus more costly the greater the magnitude of the harm that the plaintiff will incur from the denial and the greater the probability that his legal rights really have been infringed. And similarly the error of granting an injunction

> to someone whose legal rights will turn out not to have been infringed is more costly the greater the magnitude of the harm to the defendant from the injunction and the smaller the likelihood that the plaintiff's rights really have been infringed.

*Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 388 (7th Cir. 1984).

First, the Court is not overwhelmed by the harms identified by B.T. She identifies two: the "fleeting opportunity to play high school basketball" and the loss of a potential collegiate athletic scholarship. (ECF No. 25 at 11-12). Contrary to B.T.'s arguments, she has identified no case in which the opportunity to play high school sports was found to be the kind of irreparable harm that will support the entry of a preliminary injunction. B.T. cites to *A.M. by E.M. v. Indianapolis Pub. Schs.*, 617 F. Supp. 3d 950 (S.D. Ind. 2022), arguing that the Southern District in that case "granted a similar preliminary injunction in a Title IX matter." (ECF No. 25 at 11). But the harm identified in *A.M.* was not the abstract benefits of sport participation. Instead, Judge Magnus-Stinson found that A.M., a transgender female, would suffer significant psychological harms if she was prevented from playing on her high school's girls' softball team.

> As discussed above, A.M.'s mother has explained that although teachers and administrators at A.M.'s school know that A.M.'s sex at birth was male, she is known at school only as a female, is referred to by her female first name, and uses the girls' restrooms at school. She explains further that A.M.'s gender dysphoria has caused A.M. to be suicidal, depressed, anxious, and angry. A.M.'s mother believes that playing softball helped "to lessen the distressing symptoms of [A.M.'s] gender dysphoria and allowed her to experience her life more fully as a girl," which has "resulted in a better self-image and confidence." A.M.'s mother notes that prohibiting A.M. from playing on the girls' softball team will "out" her to her classmates as someone who is not "really" a girl, and "[t]his will be extremely traumatic for her and will also undermine her social transition and will injure her."

*A.M.*, 617 F. Supp. 3d at 967. The harms in *A.M.* were far more tangible, and far more serious, than those presented here.

B.T.'s claim that she will lose a future collegiate athletic scholarship is far too speculative to support relief. B.T. has not suggested that she is now being recruited to play college basketball.

She has identified no recruiting letters or scholarship offers. And neither her statistical performance nor that of the CHS' team screams out future college athlete. Compare B.T.'s evidence to her cited authority, *Washington v. Indiana High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840 (7th Cir. 1999), where none other than legendary Purdue University basketball coach Gene Keady testified that denial of the preliminary injunction would harm the plaintiff's opportunity to obtain a college scholarship. *Id.* at 853. Simply put, nothing in the record suggests that a future college scholarship for B.T. is anything but pure speculation.

On the other hand, the potential damage to Defendants if the injunction is entered is significant. In crafting injunctive relief, the Court must be mindful of the Fed. R. Civ. P. 65's requirements that the injunction must "be precise and self-contained, so that a person subject to it who reads it and nothing else has a sufficiently clear and exact knowledge of the duties it imposes on him." *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 619 (7th Cir. 1998). At least with respect to the playing time aspect of the requested injunction, the only way the Court can imagine that an order could satisfy legal requirements would be to dictate a precise amount of playing time per game. But there are simply too many factors that go into playing time to be condensed into an injunction order. What if B.T.'s game has regressed over the summer? What if other players have improved, or new players have joined the team that are more skilled than B.T.? What if B.T. gets injured? The Court will not burden Defendants with an injunction that places the Court in the position of high school basketball coach.

B.T. seemingly understands this problem so, in her reply, she argues that "playing time is only one small part of being treated fairly and equally." (ECF No. 25 at 10). This is true, but the other aspects of the requested injunction fare no better. B.T. requests that the Court enjoin Defendants from retaliating against her is a request for an "obey-the-law" injunction. These

injunctions "raise several concerns," including overbreadth and vagueness. *E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 841-42 (7th Cir. 2013). Obey-the-law injunctions are not prohibited per se but, given the Court's finding that B.T. has not shown a likelihood of success on her claim that she was retaliated against, the Court finds no reason to issue such an injunction here.

The last element of the requested injunction is to require that B.T. be a member of the CHS girls' basketball team. Defendants argue that this relief is unnecessary because B.T. already has a spot on the team. But as B.T. notes, Defendants' voluntary conduct is not determinative. A court "retains the power to grant injunctive relief" even after the defendant ceases the allegedly unlawful conduct. *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 748 (7th Cir. 1999). The moving party must show that such relief still is required. *Id*. "The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *Id*. When the cessation of an allegedly wrongful activity occurred "only after a lawsuit has been filed," a district court is "within its discretion" to find that the cessation was "not voluntary, and that even a voluntary cessation is not determinative." *Id*.

While perhaps B.T. could be removed from the team again, the Court sees this as little more than a mere possibility. The Court emphasizes that Defendants have taken steps to fully re-integrate B.T. into the team, including re-adding her to the team chat, giving her number back, and providing her with gear. And this suit will likely continue to pend through the basketball season; the Court has no doubt that B.T. will promptly inform the Court if she believes additional retaliatory conduct occurs. The Court sees no reason to use its judicial power to require what has already occurred.

In sum, the Court finds that B.T.'s requested injunction is indefinite, unworkable, and unnecessary. Imposing such an injunction on Defendants serves only to make compliance difficult,

if not impossible. Compared with B.T.'s alleged harms, which are both slight, speculative, and economic, the balancing test weighs in Defendants' favor.

**D.**     *The Public Interest does not Support an Injunction*

Finally, the Court finds that public policy weighs against the entry of an injunction. In support of her public policy argument, B.T. argues only that protecting civil rights is "always in the public interest." (ECF No. 14 at 17) (citing *B.E. v. Vigo Cnty. Sch. Corp.*, 608 F. Supp. 3d 725, 736 (S.D. Ind. 2022). True enough but, as discussed above, the Court is not convinced that B.T.'s civil rights have been violated.

Stated simply, the Court does not believe that the public interest is served by having the Court expend its limited judicial resources selecting the starting five for the CHS' girls' basketball team. And the Court has no interest in setting a precedent that it will involve itself in youth sports playing time disputes on a record as thin as this one. The public interest weighs against an injunction here.

**III.**     **Conclusion**

For these reasons, B.T.'s request for a preliminary injunction (ECF No. 13) is DENIED.

SO ORDERED on October 26, 2023.

                     s/ *Holly A. Brady*
                     CHIEF JUDGE HOLLY A. BRADY
                     UNITED STATES DISTRICT COURT